DAVID L. SMART, ESQ. (SBN 262533)
**SMART LAW OFFICES**
23 Corporate Plaza Drive, Suite 150
Newport Beach, CA 92660
Tel.: (949) 629-2588
Fax: (916) 361-6021

Attorneys for Plaintiffs
LESLIE EDWARD WALKER and ELAHE S. WALKER

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE EDWARD WALKER; ELAHE S. WALKER, | Case No.: 3:20-cv-02944 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | 1. **Breach of Contract** |
| | 2. **Breach of the Implied Covenant of Good Faith and Fair Dealing** |
| BAYVIEW LOAN SERVICING, LLC; BANK OF AMERICA, N.A; and DOES 1 through 100, | 3. **Negligence & Negligence Per Se** |
| | 4. **Intentional Infliction of Emotional Distress** |
| Defendants. | 5. **Violation of California Business and Professions Code §§17200, _et seq._: Fraudulent, Unlawful and Unfair Practices** |
| | **[JURY DEMANDED]** |

Plaintiffs LESLIE EDWARD WALKER and ELAHE S. WALKER  ("Plaintiffs")

hereby allege against Defendants, and each of them, as follows:

### PARTIES

1.     The Plaintiffs are, and at all times herein relevant were, a married couple and the owners of the real property located at 48 Tennis Club Drive, Danville, California 94506.  The property is Plaintiffs' primary residence.

2.     Defendant BAYVIEW LOAN SERVICING, LLC  ("Defendant BAYVIEW") is now, and at all times herein relevant was, a Delaware limited liability company engaged in business in the County of Contra Costa, including as a debt collector and home loan servicer as that term is defined by California Civil Code §2920.5(a).

3.     Defendant BANK OF AMERICA, N.A. ("Defendant BANA") is now, and at all times herein relevant was, a national banking association engaged in business in the County of Contra Costa, including as a debt collector and home loan servicer as that term is defined by California Civil Code §2920.5(a).

4.     The true names and capacities of Defendants named herein as DOES 1 through 100 are unknown to Plaintiffs, who therefore sues said Defendants by such fictitious names, and will amend this complaint to show their true names, involvement, and capacities when the same have been ascertained. Each fictitiously named Defendant is in some manner liable to Plaintiffs.

5.     Whenever reference is made in this complaint to any act of any corporate or other business Defendant, that reference shall mean that the corporation or other business did the acts alleged in this complaint through its officers, directors, employees, agents and/or representatives while acting within the actual and ostensible scope of their authority.

6.     As a matter of business policy, officers, directors and/or managing agents of Defendants BAYVIEW and BANA committed, ratified and/or authorized the conduct complained of herein and/or had advance knowledge of the unfitness of their employees engaged in the conduct complained of herein and employed them with a conscious disregard of the rights or safety of others, including the rights of the Plaintiffs.

7. Plaintiffs are informed and believe, and thereon allege, that at all times herein relevant, each of the Defendants was the actual and apparent agents of each of the remaining Defendants and, in doing the things herein alleged, acted within the course and scope of their actual and apparent agency and with the knowledge, notification, consent and ratification of each of the other Defendants.

8. Defendants committed the above-described acts pursuant to an agreement by and between them to harm Plaintiffs. Plaintiffs are informed and believe, and thereupon allege, that Defendants sued herein under fictitious names committed acts in furtherance of the conspiracy, and/or lent aid and encouragement to their co-conspirators, and/or ratified and adopted the acts of their co-conspirators, owed Plaintiffs a duty of care and are thus jointly and severally liable for all harm to Plaintiffs resulting from the conspiracy.

## JURISDICTION AND VENUE

9. The amount in controversy in this matter exceeds seventy-five thousand dollars ($75,000.00).

10. This Court has jurisdiction based on the complete diversity of the parties.

11. The real property securing the loan at issue and that Defendants threatened with wrongful foreclosure is located in the County of Contra Costa, State of California.

## ALLEGATIONS

12. As explained below, Defendants BAYVIEW and BANA have forced Plaintiffs to file their third lawsuit since 2016 related to the servicing of their first-lien home loan.

13. In February of 2016, Plaintiffs sent a loan modification application for their first-lien home loan to their loan servicer at the time, Residential Credit Solutions, Inc. ("RCS").

14. Despite its failure to provide Plaintiffs with a written determination of eligibility for the modification as required by the California Homeowner Bill of Rights ("HBOR"), RCS recorded a notice of default on title to Plaintiffs' home on February 25, 2016 commencing the non-judicial foreclosure process.

15. After recording the notice of default, RCS confirmed to Plaintiffs on about March 7, 2016 that it had received their loan modification application before recording the notice.

16. On about March 15, 2016, Ditech Financial, LLC ("Ditech"), sent Plaintiffs correspondence stating that it would be servicing the loan as of March 1, 2016.

17. Ditech then represented to Plaintiffs that it was reviewing the loan modification application but also simultaneously continued the foreclosure process in violation of the HBOR ban on "dual-tracking."

18. As a result, Plaintiffs filed *Walker, et al. v. Ditech Financial, LLC, et al.*, in the United States District Court for the Northern District of California, Case No. 4:16-cv-03084-KAW in June 2016.

19. From about March 2016 through the initiation of that case, Ditech maintained that it was still in the process of evaluating Plaintiffs' loan modification application.

20. After a year of fearing they would lose their home through no fault of their own, the matter was resolved and dismissed as Ditech offered Plaintiffs a trial period plan loan modification ("TPP") agreement in March of 2017 that Plaintiffs accepted.

21. Pursuant to the terms of that TPP, Plaintiffs were to make three monthly payments starting in May of 2017. Once Plaintiffs made the three payments, Plaintiffs' home loan would be "permanently modified."

22. After dismissing that case, Plaintiffs made the three payments but Ditech did not provide them with a permanent modification or a copy of the fully executed agreement evidencing the modification as required by the HBOR.

23. Plaintiffs gave Ditech's attorneys written notice of its failure to comply with the TPP agreement.

24. Plaintiffs then received correspondence from Ditech in August 2017 titled "Notice of Servicing Transfer" that stated that the servicing of their loan was being transferred to Defendant BAYVIEW as of September 1, 2017.

25. Ditech's attorney also represented to Plaintiffs that Ditech confirmed that it "reported the loan as having an active modification to Bayview. Bayview will be responsible for generating the final modification agreement."

26.     Despite being current on the loan, Plaintiffs then received correspondence from Ditech stating they were eligible for loss mitigation options and that "the longer they wait or the further they fall behind on [their] payments, the harder it will be to find a solution" and that Plaintiffs had an assigned loss mitigation associate if they wished to apply for a loan modification or other loss mitigation option.

27.     Despite Ditech's written statement that there would be a servicing transfer and the statement from its attorney, and despite being current on the loan, Plaintiffs also received correspondence from Defendant BAYVIEW dated September 8, 2017 stating that Plaintiffs were eligible for "loss mitigation" options to deal with their purported default.

28.     Plaintiffs then received "Mortgage Statements" from BAYVIEW dated September 10, 2017 and September 17, 2017 that represented Plaintiffs as being in significant default instead of acknowledging the fact that Plaintiffs complied with the TPP agreement, including all of the payments Plaintiffs had made pursuant thereto.

29.     On about September 19, 2017, Plaintiffs contacted Defendant BAYVIEW to discuss the status of Plaintiffs' home loan.  A BAYVIEW customer service representative told Plaintiffs that someone from BAYVIEW's legal department would contact them.  No one did.

30.     On September 22, 2017, a BAYVIEW customer service employee Shan Dyer did contact Plaintiffs by telephone to discuss Plaintiffs' default.  Plaintiffs informed him that they had complied with the TPP but had not received the final modification.  He stated that a BAYVIEW "manager" was handling the Plaintiffs' mortgage file and he requested Plaintiffs' contact information so that someone could call them back to discuss the loan with them.

31.     Despite Ditech's written statement that there would be a servicing transfer to BAYVIEW and the statement from its attorney, Plaintiffs received correspondence stating that the non-judicial foreclosure process had been initiated.

32.     Plaintiffs then received correspondence from BAYVIEW stating that it had assigned a specialist to help them deal with the purported default.

33.     On September 25, 2017, a notice of default was recorded on title to Plaintiffs' residence commencing the non-judicial foreclosure process.

34.    Plaintiffs then received correspondence from BAYVIEW stating that "[a] Notice of Default has been recorded on your property" and that BAYVIEW "is committed to working with [Plaintiffs] to get through this challenging time…"

35.    Left with no other option, Plaintiffs filed a second action against Ditech and BAYVIEW on November 2, 2017 titled *Walker, et al. v. Ditech Financial, LLC, et al.*, in the Superior Court for the County of Contra Costa, Case No. MSC17-02165.

36.    It was only after being served with the Application for a Preliminary Injunction that the Notice of Default was rescinded from title.

37.    In November of 2018, Plaintiffs resolved the matter with Ditech and dismissed it from the lawsuit.

38.    Plaintiffs then entered into a confidential settlement agreement (the "settlement agreement") with Defendant BAYVIEW and dismissed that action in full.

39.    Although the settlement agreement was executed in November of 2018, pursuant to its terms, Defendant BAYVIEW agreed to honor and implement the terms of the permanent modification Plaintiff should have received in 2017.

40.    Pursuant to the settlement agreement, the loan balance of $637,579.97 was increased by $218,631.15 to $856,211.12 and BAYVIEW deferred and waived the accrual of interest on $58,186.00 of that amount until December 1, 2025.

41.    Although the document memorializing the permanent modification agreement stated that the first payment was due August 1, 2017, it was incorporated into the settlement agreement, which stated that date actually reflected "the conversion modification date had the loan converted from a trial payment plan to a permanent modification."  The agreement further clarified that "[t]he reference to August 1, 2017, does not mean that Plaintiff is in default under the permanent modification."

42.    Pursuant to the settlement agreement and embedded loan modification agreement, Plaintiffs began making monthly payments of $3,397.57 to Defendant BAYVIEW starting in December of 2018.

43.     Unbeknownst to Plaintiffs, despite their performance under the agreement and being current on the loan, BAYVIEW continued, and continues now, to represent to credit agencies that Plaintiff LESLIE EDWARD WALKER was delinquent and over 120 days behind in payments on the home loan when he was current.  As a result of these false representations, Plaintiff LESLIE EDWARD WALKER's credit score and his reputation among creditors that view his credit score were, and are, suffering harm.

44.     Plaintiffs made the first of many requests to BAYVIEW that it provide written monthly loan statements in January of 2019 but did not receive a monthly statement from Defendant BAYVIEW until May of 2019.

45.     By not providing Plaintiffs with a monthly statement from January until May of 2019, BAYVIEW violated 12 CFR section 1026.41(a)(2) requiring periodic statements be sent to borrowers such as Plaintiffs.

46.     When Plaintiffs received their first statement from BAYVIEW since entering into the settlement agreement, they saw that it falsely stated a payment of $56,911.65 was due on June 1, 2019.

47.     Seeing the demand for more than fifty thousand dollars over what they owed shocked and alarmed Plaintiffs.

48.     By falsely stating the amount due and threatening late fees in statements from May of 2019 and thereafter, BAYVIEW violated 12 CFR section 1026.41(d) requiring monthly statements contain the true amount due and explanation of how the amount was calculated.

49.     On about May 7, 2019, Plaintiffs contacted Defendant BAYVIEW by telephone about the May statement.

50.     On that telephone call, a customer service representative of Defendant BAYVIEW falsely stated that Plaintiffs next payment was indeed due in the amount of $56,911.65 and that property inspection and legal fees had recently been added to Plaintiffs' loan balance for being in default.

51.     Plaintiffs were then transferred to a BAYVIEW customer service representative of who identified herself by her first name "Latoya" and who stated that she was a "supervisor."

52.     Plaintiff LESLIE E. WALKER asked Latoya why the monthly statement said Plaintiffs'
next payment was due in the amount of $56,911.65 instead of the agreed upon monthly payment
BAYVIEW had been accepting.  He also requested that it be changed to reflect the true amount.

53.     In response, Latoya also said that next payment was due in the amount of $56,911.65 and
that BAYVIEW would begin foreclosure for nonpayment of that amount despite her being aware
that Plaintiffs' did not owe that amount.  Latoya finished by rudely suggesting Plaintiffs obtain
legal representation if they were not satisfied with her response.

54.     After speaking with BAYVIEW's representatives that day, Plaintiffs felt humiliated.
Plaintiffs also believed they again needed to spend money to hire an attorney, that they might lose
their home to foreclosure through no fault of their own at their advanced age and with their limited
income, and that they were not free from the litigation and uncertainty that came with it that they
had already been forced to endure for years.

55.     After speaking with BAYVIEW's representatives, Plaintiffs were also uncertain whether
BAYVIEW was claiming that Plaintiffs owed an additional fifty thousand dollars on top of the
amount agreed to in the settlement agreement.

56.     After speaking with BAYVIEW's representatives that day, Plaintiffs also began to have
frequent thoughts and nightmares related to losing their home to foreclosure and being homeless.
Plaintiffs began to suffer from sleeplessness and anxiety.

57.     As a result of BAYVIEW's demand that Plaintiffs make a home loan payment of
$56,911.65 and its failure to correct their error, Plaintiffs sent Defendant BAYVIEW a Qualified
Written Request ("QWR") pursuant to 12 USC §2605, *et seq.* of the Real Estate Settlement
Procedures Act ("RESPA") on about May 20, 2019.

58.     RESPA requires loan servicers like BAYVIEW to respond to certain correspondence (i.e.,
QWRs) from borrowers.  RESPA defines a "QWR" as: a written correspondence, other than notice
on a payment coupon or other payment medium supplied by the servicer, that (i) includes, or
otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a
statement of the reasons for the belief of the borrower, to the extent applicable, that the account is

in error or provides sufficient detail to the servicer regarding other information sought by the borrower.  Once "received," a loan servicer must respond to a QWR within 30 business days.

59.     Defendant BAYVIEW sent Plaintiffs a response to their QWR on about June 14, 2019 in which it made false representations including that the monthly statements it sent to Plaintiffs were correct and that the loan information therein was displayed in a manner in accordance with the law.

60.     Plaintiffs were forced to expend fees and costs to hire a law firm to protect their rights and to send Defendant BAYVIEW a second QWR on about September 9, 2019.

61.     The second QWR again provided notice to BAYVIEW that Plaintiffs and BAYVIEW were parties to an agreement which required BAYVIEW to board the terms of a loan modification into its system and begin servicing the loan, including sending statements to and collecting payments, pursuant to the terms of that loan modification.

62.     The QWR also stated that the first statement they received by mail indicated that they were $53,514.08 past due and a payment of $56,911.65 was due by June 1, 2019 but that they were in fact only due to make one payment and the account was not past due for any amount.

63.     It also stated that BAYVIEW's response dated June 10, 2019 included the accounting for the loan but that it did not reflect the terms of the loan modification agreement entered into nor did it match the incorrect figures in the monthly statements Plaintiffs continued to receive on a monthly basis since the May statement.

64.     Defendant BAYVIEW sent Plaintiffs confirmation of receipt of the second QWR on about September 17, 2019 but did not comply with the settlement agreement or rescind its demand that Plaintiffs make a monthly payment substantially higher than the amount due.

65.     In about November of 2019, Plaintiffs were informed that BANA would be taking over in place of BAYVIEW as their loan servicer.

66.     Plaintiffs hoped that BANA would demand the amount actually due of Plaintiffs. However, when Plaintiffs received their first monthly statement from BANA in December of 2019, it falsely represented that Plaintiffs' next payment was due in the amount of $56,911.65.

67.     Plaintiffs contacted BANA by telephone hoping that BANA would recognize that the statements in the monthly statement were untrue and demand for payment therein unwarranted.

However, BANA's customer service representatives stated to Plaintiffs that the next payment was due in the amount of $56,911.65 and that late fees would be added it that payment was not made in full.

68.     When Plaintiffs received their next monthly statement in January of 2020, it also falsely represented that their next payment was due in the amount of $56,911.65 and for the first time included the threat that late fees would be added it that payment was not made in full.

69.     After speaking with BANA's representative, Plaintiffs continued their belief that they needed to spend money on attorney's fees and costs, that they might lose their home to foreclosure through no fault of their own at their advanced age and with their limited income, and that they were not free from the litigation and uncertainty that came with it that they had already been forced to endure for years.

70.     Plaintiffs were also uncertain whether BANA was also claiming that Plaintiffs owed an additional fifty thousand dollars on top of the amount agreed to in the settlement agreement and continued to have frequent thoughts and nightmares related to losing their home to foreclosure and being homeless and continued to suffer from sleeplessness and anxiety.

71.     It was not until after Plaintiffs expended further fees and costs and BANA was served with this lawsuit that BANA corrected the monthly statements which now reflect the amount due.

72.     Defendants BAYVIEW and BANA breached the terms of the agreement and embedded loan modification and by filing this action, Plaintiffs are exercising their right to seek damages, including for fees and costs enforcing the agreement, and for injunctive relief, including to correct Plaintiff LESLIE EDWARD WALKERS's credit and return fees and costs incurred in enforcing the settlement agreement and loan modification.

73.     Plaintiffs have been, and will continue to be, seriously injured unless Defendant BAYVIEW and BANA's activities complained of are not preliminarily and permanently enjoined.  Plaintiffs will suffer irreparable injury of a continuing nature that cannot be adequately calculated or compensated in money damages.

### FIRST CAUSE OF ACTION
**Breach of Contract**
**(Against All Defendants)**

74.     Plaintiffs incorporate by reference the allegations set forth above.

75.     To state a claim for breach of contract, a plaintiff must show that (1) a contract existed; (2) the plaintiff performed his duties or was excused from performing his duties under the contract; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of that breach.

76.     Plaintiffs are signatories to, and beneficiaries of, a settlement agreement with and embedded loan modification of their home loan with their loan servicer, Defendant BAYVIEW and now Defendant BANA, and have performed all of their obligations thereunder.

77.     Defendant BAYVIEW breached the settlement agreement and embedded loan modification by making false representations to credit bureaus that Plaintiff LESLIE EDWARD WALKER was delinquent and over 120 days behind in payments on the home loan when he was not.

78.     As an actual and proximate result of those false representations, Plaintiff LESLIE EDWARD WALKER's suffered harm to his credit score and his reputation among creditors that viewed his credit score.  This harm is ongoing.

79.     Defendant BAYVIEW also breached the settlement agreement and embedded loan modification by failing to implement the terms of the agreement and ending Plaintiffs monthly statements containing false representations, demanding amounts due that were not in fact due in those statements, and adding fees to the loan balance that were not due.

80.     Defendant BAYVIEW also breached the settlement agreement and embedded loan modification by falsely stating that it would not honor the terms of the agreement and continue to demand payments of a sum far above what was due.

81.     As an actual and proximate result of BAYVIEW's breach, Plaintiffs have also been forced to retain a law firm to enforce their rights and have incurred and will incur costs and reasonable attorney's fees in connection herewith, including for having to expend time and effort to enforce the settlement agreement and then in fees in costs in pursuing litigation.  It was only after Plaintiffs secured legal representation, incurred costs in filing a lawsuit, did BANA attempt to

rectify its conduct. Plaintiffs are entitled to attorney's fees and costs, including but not limited to all filing fees, pursuant to provisions of the settlement agreement and loan modification.

82.     Defendant BANA, as the current servicer of the loan and successor to Defendant BAYVIEW, breached the settlement agreement and embedded loan modification of the home loan by failing to implement the terms of the agreement, sending Plaintiffs monthly statements containing false representations, demanding amounts due that were not in fact due in those statements, and adding fees to the loan balance that were not due.

83.     Defendant BANA also breached the settlement agreement and embedded loan modification by falsely stating to Plaintiffs that it would not honor the terms of the agreement and continue to demand payments of a sum far above what was due.

84.     As an actual and proximate result of BANA's breach, Plaintiffs were forced to retain a law firm to enforce their rights and have incurred and will incur costs and reasonable attorney's fees in connection herewith, including for having to expend time and effort to enforce the settlement agreement and then in fees in costs in pursuing litigation in order to get BANA to correct the loan statements. Plaintiffs are entitled to attorney's fees and costs recovery pursuant to provisions of the settlement agreement and loan modification.

**SECOND CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against All Defendants)**

85.     Plaintiffs incorporate by reference the allegations set forth above.

86.     In every contract there is an implied covenant of good faith and fair dealing by each party not to do anything which will deprive the other parties of the benefits of the contract, and a breach of this covenant by failure to deal fairly or in good faith gives rise to an action for damages.

87.     The covenant imposes on each party to the contract the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, and also the duty to do everything that the contract presupposes that each party will do to accomplish its purpose.

88.     Defendant BAYVIEW breached the implied covenant of good faith and fair dealing by failing to honor and implement the terms of the agreement and embedded loan modification, including by continuing to report Plaintiff LESLIE EDWARD WALKER as delinquent on his credit rating and threatening to conduct a non-judicial foreclosure when Plaintiffs were not in default.

89.     As an actual and proximate result of BAYVIEW's breach of the implied covenant of good faith and fair dealing, BAYVIEW frustrated Plaintiffs ability to enjoy the benefit of the agreement entered into, namely having a credit rating free of false mortgage delinquency information and not suffering from constant fear of non-judicial foreclosure while knowing protecting their rights would require litigation and incurring additional attorney's fees and court costs.  Plaintiffs were indeed forced to retain a law firm to enforce their rights and have incurred and will incur costs and reasonable attorney's fees in connection herewith, including for having to expend time and effort to enforce the settlement agreement and then in fees in costs in pursuing litigation in order to get BAYVIEW to correct the loan statements.  Plaintiffs are entitled to attorney's fees and costs recovery pursuant to provisions of the settlement agreement and loan modification.

90.     Defendant BANA breached the implied covenant of good faith and fair dealing by demanding payment threatening that non-payment of the inflated sum would result in imposition of late fees and foreclosure.

91.     As an actual and proximate result of BANA's breach of the implied covenant of good faith and fair dealing, BANA frustrated Plaintiffs ability to enjoy the benefit of the agreement entered into, namely having a credit rating free of false mortgage delinquency information and not suffering from constant fear of non-judicial foreclosure while knowing protecting their rights would require litigation and incurring additional attorney's fees and court costs.  Plaintiffs were indeed forced to retain a law firm to enforce their rights and have incurred and will incur costs and reasonable attorney's fees in connection herewith, including for having to expend time and effort to enforce the settlement agreement and then in fees in costs in pursuing litigation in order to get BANA to correct the loan statements, which it ultimately did in about March of 2020.

Plaintiffs are entitled to attorney's fees and costs recovery pursuant to provisions of the settlement agreement and loan modification.

92. Defendants BAYVIEW and BANA, including their officers and agents authorized to enter into the Agreement on their behalf, acted fraudulently, maliciously and oppressively with a conscious, reckless and willful disregard, and/or with callous disregard, of the probable detrimental and economic consequences to Plaintiffs, and to the direct benefit of Defendants BAYVIEW and BANA, knowing that their conduct was substantially certain to vex, annoy, and injure Plaintiffs. Said conduct entitles Plaintiffs to punitive damages under California Civil Code §3294, in an amount sufficient to punish or make an example of Defendants BAYVIEW and BANA.

### THIRD CAUSE OF ACTION
**Negligence & Negligence Per Se**
**(Against All Defendants)**

93. Plaintiffs incorporate by reference the allegations set forth above.

94. To support a negligence cause of action, a plaintiff must plead and prove: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the duty, and (3) the breach was a proximate or legal cause of the plaintiff's injuries.

95. Defendant BAYVIEW owed Plaintiffs a duty to use reasonable care in handling and implementing Plaintiffs' settlement agreement and loan modification.

96. California Evidence Code Section 669 states, in pertinent part: (a) The failure of a person to exercise due care is presumed if: (1) He violated a statute, ordinance, or regulation of a public entity; (2) The violation proximately caused death or injury to person or property; (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."

97. Defendants BAYVIEW and BANA also owed duties of care to Plaintiffs to comply with 12 CFR §1026.41, *et seq.* but failed to do so.

98. Defendant BAYVIEW 12 USC §2605, *et seq.* of the Real Estate Settlement Procedures Act but failed to do so.

99. The conduct prescribed by the statutes is the standard of care. A violation of a statute is presumed to be negligence.

100. Defendant BAYVIEW breached the duty to use reasonable care, and the statutes listed above, by mishandling and failing to honor the terms of Plaintiffs' settlement agreement and loan modification. It did so by failing to report the correct information to credit rating agencies and instead reporting that Plaintiff LESLIE EDWARD WALKER was in breach of the loan after it was current and by forcing Plaintiffs to incur costs and expenses seeking to remedy BAYVIEW's breach through correspondence and retaining a law firm to enforce their rights and begin litigation.

101. As a proximate and direct cause of Defendants BAYVIEW and BANA's conduct as herein alleged, Plaintiffs have suffered, and will continue to suffer, damages the exact amount of which have not been fully ascertained but are within the jurisdiction of this Court. Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial. Plaintiffs have further been forced to retain a law firm to enforce their rights and have incurred and will incur costs, including but not limited to filing fees, and reasonable attorney's fees in connection herewith, recovery of which Plaintiffs are entitled to according to proof.

## FOURTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

102. Plaintiffs incorporate by reference the allegations set forth above.

103. An intentional infliction of emotional distress claim exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

104.    Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interests; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress.

105.    Borrowers can bring actions against lenders for emotional distress caused by the lender's intentional or reckless conduct that it should have known would cause such distress.

106.    Defendant BAYVIEW and then Defendant BANA engaged in extreme and outrageous unprivileged conduct.  Such conduct includes knowingly making false statements about what Plaintiffs owed under their loan agreement and whether they would foreclose on Plaintiffs' home.

107.    This extreme and outrageous conduct was either intended or done in reckless disregard of the probability of causing severe emotional distress to Plaintiffs, and did proximately cause such distress.

108.    Defendant BAYVIEW's conduct was outrageous as it abused its position as Plaintiff's loan servicer which gave it power to damage Plaintiffs' interests with the power to pursue a non-judicial foreclosure through the power of sale without judicial oversight.

109.    Defendant BAYVIEW's conduct was also outrageous as it was aware Plaintiffs were particularly vulnerable and susceptible to injuries through mental distress, including because it was aware that Plaintiffs were elderly and thus a protected class, because it was aware that Plaintiffs had only recently finished enduring years of litigation that would decide whether they would be able to keep their residence, and because it was aware Plaintiffs were already suffering from emotional distress.

110.    Defendant BAYVIEW's conduct was also outrageous as it acted unreasonably in demanding payment of over $50,000 beyond what Plaintiffs' owed and in threatening foreclosure if payment was not made, with the recognition that doing so was likely to result in illness to Plaintiffs through emotional distress.

111.    As a proximate cause of BAYVIEW's conduct, Plaintiffs' suffered severe emotional distress.

112. Defendant BANA's conduct was outrageous as it abused its position as Plaintiff's loan servicer which gave it power to damage Plaintiffs' interests with the power to pursue a non-judicial foreclosure without judicial oversight.

113. As a proximate and direct cause of Defendants BAYVIEW and BANA's conduct as herein alleged, Plaintiffs have suffered, and will continue to suffer, damages the exact amount of which have not been fully ascertained but are within the jurisdiction of this Court. Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial. Plaintiffs have further been forced to retain a law firm to enforce their rights and have incurred and will incur costs and reasonable attorney's fees in connection herewith, recovery of which Plaintiffs are entitled to according to proof.

114. Defendants BAYVIEW and BANA, including their officers and agents, acted fraudulently, maliciously and oppressively with a conscious, reckless and willful disregard, and/or with callous disregard, of the probable detrimental and economic consequences to Plaintiffs, and to the direct benefit of Defendants, knowing that this conduct was substantially certain to vex, annoy, and injure Plaintiffs. Said conduct entitles Plaintiffs to punitive damages under California Civil Code §3294, in an amount sufficient to punish or make an example of Defendants.

**FIFTH CAUSE OF ACTION**
**Violations of Business & Professions Code §§17200, *et seq*.:**
**Fraudulent, Unlawful and Unfair Business Practices**
**(Against All Defendants)**

115. Plaintiffs incorporate by reference the allegations set forth above.

116. Plaintiffs are informed and believe, and on that basis allege, that Defendants BAYVIEW and BANA's acts, as alleged hereinabove, constitute unlawful, unfair and/or fraudulent business practices, as defined by California Business and Professions Code §§17200, *et seq*. ("UCL").

117. Defendants BAYVIEW and BANA engaged in "fraudulent" and "unfair" practices under the UCL.

118. Plaintiffs lost money and property as a result of these unlawful, unfair, and fraudulent practices, including damage to their credit and being required to incur attorney's fees and costs enforcing their rights under the settlement and modified home loan agreement.

119.    Defendant BAYVIEW's gross overstatement of the amount due under the loan, making false representations that Plaintiffs are in default when they are not, threatening foreclosure and creating a false accounting record instead of rectifying the issue when brought to its attention and forcing Plaintiffs to send a second QWR and then sue were, at a minimum, misleading.

120.    Defendant BANA's gross overstatement of the amount due under the loan, making false representations that Plaintiffs are in default when they are not and threatening foreclosure instead of rectifying the issue when brought to its attention and forcing Plaintiffs to sue in order to finally get it rectified were, at a minimum, misleading.

121.    Such conduct also violated the laws and underlying legislative policies designed to prevent foreclosures including because Defendants BAYVIEW and BANA and their representatives' inaccurate statements regarding amounts due are practices likely to deceive the public and it and its representatives' misrepresentations and possible concealment of Plaintiffs' loan status led to Plaintiffs spending time and money to rectify the matter and to suffer extreme emotional distress.

122.    Defendants BAYVIEW and BANA also engaged in "unlawful" practices under the UCL based on the common law causes of action and statutory violations complained of herein.

        **WHEREFORE**, Plaintiffs pray for judgment against Defendants BAYVIEW and BANA as set forth below:

    a.  For compensatory damages in an amount to be determined by proof at trial;

    b.  For special damages in an amount to be determined by proof at trial;

    c.  For general damages in an amount to be determined by proof at trial;

    d.  For punitive damages;

    e.  For reasonable attorney's fees, including costs and expenses, according to proof;

    f.  For declaratory and injunctive relief, including for correction of Plaintiffs' credit scores and a declaration that Plaintiffs are the prevailing party;

    g.  For judgment setting forth terms of restitution;

    h.  For any prejudgment or other interest according to law;

    i.  Any other and further relief that this Court deems equitable and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury.

DATED:  June 24, 2020                    Respectfully submitted,

SMART LAW OFFICES


_____/s/ David L. Smart_____
David L. Smart
Attorney for Plaintiffs
LESLIE EDWARD WALKER and
ELAHE S. WALKER

# <u>PROOF OF SERVICE</u>

I am employed in the City of Newport Beach, County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 23 Corporate Plaza Drive, Suite 150, Newport Beach, CA 92660.

On June 25, 2020, I served the following documents on the persons below as follows:

**FIRST AMENDED COMPLAINT**

Ian A. Rambarran, Esq.  
Raja A. Hafed, Esq.  
Klinedinst  
801 K St., Suite 2100  
Sacramento, CA 95814  
(916) 444-7573  
*Counsel for Defendant BAYVIEW LOAN SERVICING, LLC*

Eleanor M. Roman, Esq.  
Severson & Werson  
One Embarcadero Center, Suite 2600  
San Francisco, CA 94111  
(415) 398-3344  
*Counsel for Defendant BANK OF AMERICA, N.A.*

☐ (MAIL) I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Sacramento, California.

☐ (OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by Federal Express , an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for.

☐ (MESSENGER SERVICE) I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed and provided them to a professional messenger service for service. A separate Personal Proof of Service provided by the professional messenger service will be filed under separate cover.

☐ (FACSIMILE) Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

☐    (E-MAIL or ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒    (CM/ECF Electronic Filing) I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth above pursuant to Fed.R.Civ.P.5(d)(1). "A Notice of Electronic Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as required by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction this service was made and that the foregoing is true and correct.

☐    (State)    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒    (Federal)    I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **June 25, 2020**, at Newport Beach, California.

| David L. Smart | /s/ David L. Smart |
|---|---|
| (Type or print name) | (Signature) |